IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:19-CR-141-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) MEMORANDUM AND |
| | ) RECOMMENDATION |
| JOSE AGUIRRE-CUENCA, | ) |
| Defendant. | ) |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion To Suppress Evidence" (Document No. 20) filed November 27, 2019 and the Government's responsive pleadings (Document Nos. 23, 29). Having carefully considered the motion, the record, and applicable authority, as well as the testimony and arguments presented at a hearing conducted on March 4, 2020, the undersigned will recommend that the motion be granted in part and denied in part.

## I. PROCEDURAL BACKGROUND

On May 22, 2019, Defendant Jose Aguirre-Cuenca ("Defendant") was charged in a Bill of Indictment (Document No. 9) with unlawful possession of a firearm by an illegal alien and illegal re-entry following deportation. On November 27, 2019, Defendant filed his "Motion To Suppress" (Document No. 20), in essence seeking to suppress all of the Government's evidence in the case on constitutional grounds. On December 11, 2019, the Government filed its "Government's Response To Defendant's Motion To Suppress Evidence" (Document No. 23), and more recently, on March 4, 2020, the Government filed its "Memorandum Of Law On BWC Activation And Due Process" (Document No. 29).

The question before the Court is whether law enforcement officers violated Defendant's constitutional rights in their interaction with him on April 20, 2019, and if so, whether any or all of the Government's evidence should be suppressed. For the reasons stated, the Court finds that no constitutional violation occurred regarding the officers' use of their body-worn cameras, the stop and frisk of Defendant at the scene, and the search of Defendant's vehicle. However, the questioning of Defendant on the scene was improper, and any statements made by him must be suppressed.

## II. FACTUAL SUMMARY

At the March 4, 2020 hearing in this matter, the Government presented the testimony of three officers of the Charlotte-Mecklenburg Police Department: Officer Ryan Tran-Thompson, Officer John R. Michal, and Officer Timothy Abramo. Defendant, Jose Aguirre-Cuenca, also testified on his own behalf. Certain exhibits were admitted into evidence, including body-worn camera footage from each officer and the Charlotte-Mecklenburg Police Department's Body-Worn Camera Directives Guide.

### A. Witness Testimony

Officer Tran-Thompson testified that he had been a Charlotte-Mecklenburg police officer for four a half years and was assigned to the North Tryon Division as a patrol officer. On April 20, 2019, he was on duty and working third shift when he received a call for service regarding a vehicle that had struck a pole on North Tryon Street. When he arrived on scene at around 4:00 a.m., Officer Tran-Thompson observed that the car, a four-door sedan, was partially in the roadway, with its rear still in the far right hand lane and its front up on the curb and the sidewalk. He parked his patrol cruiser directly behind the car.

Officer Tran-Thompson saw Defendant initially sitting in the driver's seat of the vehicle; he was the only occupant of the vehicle. The officer observed Defendant reaching toward the rear passenger area, towards the floorboard. The officer got out of his patrol cruiser, and as he approached Defendant's vehicle, Defendant was "still digging around in the rear of the vehicle." (Document No. 30, Tr. p. 12). Defendant got out of his vehicle and walked toward the officer. As Defendant approached, the officer noticed multiple beer cans in the back of the vehicle where Defendant had been reaching. Defendant and Officer Tran-Thompson encountered one another on the passenger side of Defendant's vehicle.

The officer observed that Defendant "appeared to be under the influence of an impairing substance. He looked a little unsteady as he was walking, and [had] bloodshot eyes." (Document No. 30, Tr. p. 13). The officer described Defendant's gait as normal, but a little sluggish. He also observed that Defendant had his hands in his pockets; he continued putting his hands in his pockets despite the officer attempting to communicate that he not do that – both in words and by gestures. Based on Defendant repeatedly putting his hands in his pockets, the officer decided to conduct a frisk of Defendant for his safety. During the frisk, the officer ran his right hand over Defendant's front left pants pocket. He immediately felt what he believed to be a bullet seated in a firearm magazine.

Officer Tran-Thompson testified that he was wearing his body-worn camera (BWC) during his encounter with Defendant. He acknowledged on direct examination that he had received training on when he should activate his BWC. He also testified about how the Charlotte-Mecklenburg Police Department maintains the visual recordings that are captured by BWCs. Officers have no ability to edit or manipulate the footage captured by the BWCs. Officer Tran-Thompson acknowledged that he did <u>not</u> activate his BWC until he was on the scene standing with

3

Defendant and had concluded he would conduct a frisk of Defendant. The video recording from Officer Tran-Thompson's BWC was admitted into evidence and played as part of the hearing.

The cross-examination of Officer Tran-Thompson by counsel for Defendant was devoted largely to the issue of the BWC. The officer conceded that the CMPD regulations require that the BWC be turned on before arrival on scene in most situations. Counsel for Defendant asked the officer a series of questions about the Charlotte-Mecklenburg Police Department Body-Worn Camera Directives Guide, which was admitted as an exhibit. These questions included the following exchange:

> Q And what that says is "BWC, body-worn cameras, shall be turned on and activated prior to arrival to any call for service or any crime-related interaction with citizens while on duty or working secondary employment." Is that what that says?
>
> A Yes, sir.

Also on cross-examination, counsel for Defendant asked the officer about his testimony regarding how Defendant exited his vehicle. One of the Government's written pleadings in the case states that the officer instructed Defendant to get out of his car. Officer Tran-Thompson testified that he did not recall ever saying that he instructed Defendant to get out of his car. His recollection is as he testified – that Defendant exited his vehicle on his own, and that the Government's pleading is in error.

Officer John R. Michal testified that he had been a Charlotte-Mecklenburg police officer for a little over 13 years. He had worked the North Tryon Division as a patrol officer for his entire career, and he was on duty during the early morning hours of April 20, 2019. Officer Michal received a call for service regarding a possible accident and a vehicle in the roadway. Before responding, Officer Michal activated his BWC, and he then drove to the area on North Tryon Street where the vehicle was parked in the road.

4

As Officer Michal arrived on scene, he observed Officer Tran-Thompson placing cuffs on Defendant. Officer Tran-Thompson informed Officer Michal that Defendant had a firearm magazine in his pocket and that there were open containers in the vehicle. Officer Michal observed the open containers in the vehicle, and he then conducted a search of the back passenger compartment of the vehicle. (Officer Tran-Thompson had told Officer Michal that Defendant had been "messing around with something" in that area of the vehicle.) (Document No. 30, Tr. p. 53). Officer Michal picked up a jacket or shirt in that area, and a firearm fell out of it. Specifically, the firearm was a black handgun, which the officer photographed and left to be seized.

On cross-examination, counsel for Defendant asked Officer Michal some questions regarding his BWC. The officer acknowledged that the CMPD regulations regarding BWCs require that BWCs be activated prior to arrival to any call for service. Officer Michal also stated that there is no general exception for a call to respond to an accident. Officer Michal also noted that, under the regulations, an officer conducting a search authorized by a warrant or by exigent circumstances should record with his BWC until the search has been concluded and all evidence has been located and confiscated. This latter provision, he conceded, would have applied to the search of Defendant's vehicle. The video recording from Officer Michal's BWC was admitted into evidence and played as part of the hearing.

Officer Timothy Abramo testified that he had been a Charlotte-Mecklenburg police officer since July of 2012. Officer Abramo has been assigned as a patrol officer in the North Tryon Division since April of 2013, and he was on duty and working during the early morning hours of April 20, 2019. He received a call for service regarding a single car accident at North Tryon Street and Old Concord Road, and he drove to the scene in his patrol cruiser. Upon arrival, he noticed a beige four-door sedan partially in the roadway and two fellow officers, Officers Tran-Thompson

5

and Michal.  As he approached, Officer Tran-Thompson informed him that Defendant "potentially had a firearm accessory in [his] pocket."  (Document No. 30, Tr. p. 63).

Officer Abramo confirmed that he was wearing his BWC on the night of the incident.  He had worn a BWC of this type for at least a year prior to this incident.  He stated that he was familiar with CMPD policy regarding activation of the BWC and the retention of the video footage made by the BWCs.  Officer Abramo stated that he activated his BWC as he approached the scene on North Tryon Street that night and that he had reviewed the footage from the BWC, and found it accurate.  The video recording from Officer Adamo's BWC was admitted into evidence and played as part of the hearing.

Officer Abramo also confirmed that he was aware of Officer Michal's search of Defendant's vehicle that night.  Officer Michal informed Officer Abramo on the scene that he located a firearm in the back passenger area of the vehicle in the vicinity of a black jacket or sweatshirt.

Defendant, Jose Aguirre-Cuenca, testified through an interpreter at the hearing.  Defendant testified that the first officer who arrived (Officer Tran-Thompson) approached the driver's side of Defendant's vehicle.  Defendant informed the officer as best he could in English that his car had broken down (he testified he said "my car no work").  (Document No. 30, Tr. p. 75).  Defendant testified that he got out of his car because the officer asked him to;  he did not get out on his own.  He also stated that he never reached into the back seat area as Officer Tran-Thompson had testified.

On cross-examination, Defendant conceded that he had been drinking that night, but asserted that the beer cans in the back seat were not his.  He also conceded that he had a firearm magazine in his pocket – the one located by Officer Tran-Thompson.  Defendant admitted he

6

provided the officers on the scene the name "Luis Aguilar," instead of his actual name, though he claimed to have done so in error.

### B. Exhibits

In addition to witness testimony, a number of exhibits were admitted at the hearing – most importantly, the footage from the BWCs worn by the officers. While a written summary of their contents is difficult to set forth, a few points are worth making. The visual clarity of the videos is quite good; however, because of the windy conditions and other factors, the audio is occasionally unclear. Officer Tran-Thompson's video begins, as noted, when he is frisking Defendant and does not capture his arrival on scene and his initial encounter with Defendant. All the BWC videos reflect that no Miranda warnings were given to Defendant and that questions were asked, and answers given, while Defendant was wearing cuffs or otherwise detained.

### III. STANDARDS OF REVIEW

In considering the lack of BWC evidence, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute denial of due process of law. Arizona v. Youngblood, 488 U.S. 51, 58 (1998); United States v. Sanders, 954 F.2d 227, 231 (4th Cir. 1992).

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu,

7

534 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

The Supreme Court has described "probable cause" to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). However, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232.

The probable cause standard does not:

> require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

Taylor v. Farmer, 13 F.3d 117, 121-22 (4th Cir.1993); accord Ornelas v. United States, 517 U.S. 690, 696 (1996) (probable cause exits "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found").

Miranda warnings are required when a subject is interrogated while in custody. Miranda v. Arizona, 384 U.S. 436 (1966). Accord Dickerson v. United States, 530 U.S. 428, 444 (2000) (reaffirming Miranda as "a constitutional rule that Congress may not supersede legislatively," reversing unique Fourth Circuit holding to the contrary). The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (internal quotations omitted).

8

## IV. DISCUSSION

### A. BWC Evidence

The issue of BWC evidence is a threshold issue in this case. Defendant disputes Officer Tran-Thompson's assertion that Defendant exited the car voluntarily. Rather, Defendant contends that Officer Tran-Thompson ordered Defendant to exit the vehicle without probable cause or reasonable suspicion that he had committed a crime. (Document No. 20, p. 3). As a result, Defendant argues that "any evidence gathered therefrom must be suppressed." Id. (citing Wren v. United States, 517 U.S. 806, 809-10 (1996); Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977); Terry v. Ohio, U.S. 1 (1968)). Thus, hanging over this case is Officer Tran-Thompson's, and to a lesser extent Officer Michal's, alleged noncompliance with CMPD BWC policy and the subsequent failure to record the disputed interaction. As such, the Court must address this issue first.

Defendant asserts that the issue of whether Defendant was ordered out of the vehicle would not be in dispute at all if Officer Tran-Thompson had activated his BWC in accordance with CMPD policy, which requires officers to activate their BWCs prior to arrival to any call for service. (Document No. 20, p. 3) (citing Document No. 30, Defendant's Exhibit No. 1, p. 7) (emphasis added). Defendant argues "[t]he arresting officer, however, did not activate his camera upon receiving the call for service; nor upon arriving at the scene; nor when he supposedly saw Mr. Aguirre-Cuenca reaching behind the passenger seat towards the floorboard of the vehicle; nor when first interacting with Mr. Aguirre-Cuenca; nor when Mr. Aguirre-Cuenca exited the vehicle." (Document No. 20, p. 3). Defendant states that, not only did Officer Tran-Thompson's actions violate CMPD guidelines, but also "[t]he deliberate choice not to record was therefore in 'bad faith' under Youngblood." (Document No. 20, p. 4-5) (citing Youngblood, 488 U.S. at 56)

9

(holding that failure to preserve potentially exculpatory evidence does not violate due press so long as the officers were acting in "good faith and in accord with their normal practice."). Defendant asks the Court to "exclude testimony by a police officer as violative of due process under the Fifth Amendment when the testimony relates to an incident the officer chose not to record on video although police regulations required him to do so." (Document No. 20, p. 4).

In response, the Government asserts that even if Officer Tran-Thompson's delay in activating his BWC violated CMPD guidelines, "any delay was not done in bad faith. Therefore no due process violation occurred and defendant's motion to suppress should be denied." (Document No. 29, p. 1) (citing Youngblood, 488 U.S. at 58) ("[U]nless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). While the Government noted that Youngblood involved the officers' failure to preserve evidence, the Government argues that Defendant must similarly prove "bad faith" in a case where the Officer failed to collect evidence. (Document No. 29, p. 3).

After careful consideration of the record, the undersigned does not find bad faith on the part of Officer Tran-Thompson and therefore declines to suppress his testimony. In Youngblood, the Court held that bad faith is evidenced "when the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Youngblood, 488 U.S. at 58; see also Miller v. Vasquez, 868 F. 2d 1116, 1120 (9th Cir. 1998) (holding that Youngblood applies with equal force to law enforcement's collection of evidence). In other words, for due process concerns to arise in the instant case, Defendant must show that the video evidence must have had exculpatory value and that the officers declined to activate their BWC in bad faith. Bad faith requires more than a showing of mere negligence, but rather "must turn on the police's knowledge

of the exculpatory value of the evidence at the time it was lost or destroyed." Holdren v. Legursky, 16 F.3d 57, 60 (4th Cir. 1994) (citing Youngblood, 488 U.S. at 56-57); see also California v. Trombetta, 467 U.S. 479, 488 (1984) (finding no constitutional violation when "[t]he record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence.").

Most courts that have addressed this issue have generally declined to find bad faith as a result of non-compliance with BWC activation policies. See United States v. Taylor, 312 F.Supp. 3d 170, 178 (D.D.C. 2018) (finding that an officer's "failure to activate his body-worn camera does not constitute prima facie evidence of bad faith" because of "the Supreme Court's clear admonition that neither negligence nor incompleteness violates the Due Process Clause"); see also United States v. Brown, 2017 WL 8941247, at *15-17 (D.Nev. Aug. 14, 2017) (finding that "at most, the Government's conduct evidenced negligence, not bad faith" and noting that "body cameras are new devices that officers . . . are still getting acclimated to using."); United States v. Tillard, 2020 WL 57198, at *6-7 (W.D.N.Y. Jan. 6, 2020) (declining to find bad faith because both officers "offered consistent testimony" and explained they "were pursuing a suspect fleeing at full sprint" and "had their cameras for thirty working days or less."); United States v. Griffin, 2018 WL 4929397, at *4 (E.D.Wis. Oct. 11, 2018) (declining to suppress evidence because, even though the officer had "a habit of not activating his body camera as soon as called for under the department's policy," the court believed and could corroborate the officer's testimony).

In the present case, it is true that Officer Tran-Thompson deprived the Court of the opportunity to review the best evidence available when he failed to adhere to CMPD policy and activate his BWC prior to arriving on the scene. See United States v. Gibson, 366 F.Supp.3d (D.D.C. 2018) (finding "[b]y failing to adhere to MPD policy and activate their body-worn

11

cameras, the MPD officers deprived the Court from reviewing the best evidence available" but ultimately granting suppression on other grounds). However, the fact that the videotape may potentially be exculpatory is not enough to satisfy <u>Youngblood</u>'s requirement that the police acted in bad faith. <u>Youngblood</u>, 488 U.S. at 56-58.

Moreover, Officer Tran-Thompson's failure to comply with CMPD guidelines is not sufficient to show bad faith. <u>See</u> <u>Elmore v. Ozmint,</u> 661 F.3d 783, 831 (4th Cir. 2011) (finding the negligent erasure of the tape of a bank robbery was not bad faith). Indeed, the Fourth Circuit has held that bad faith requires that the "police intentionally withhold or destroy evidence, or otherwise act in bad faith." <u>Gilliam v. Sealey</u>, 932 F.3d 216, 241 (4th Cir. 2019) (citing <u>Jean v. Collins</u>, 221 F.3d 656, 663 (4th Cir. 2000) (en banc) (Wilkinson, C.J., concurring)). In the present case, Defendant provided no evidence to suggest that Officer Tran-Thompson failed to activate his BWC in an attempt to hide evidence or intentionally to gain a tactical advantage. <u>See</u> <u>Taylor</u> 312 F.Supp.3d at 178 ("Nor is there any basis to believe the Officer . . . failed to activate the camera in order to hide or obscure evidence."). As a result, the undersigned will decline to recommend suppression of Officer Tran-Thompson's testimony for failure to activate his BWC.

It is noteworthy, however, that Officer Tran-Thompson acknowledged his regular non-compliance with CMPD BWC policy requiring officers to activate their BWC prior to arriving for any service call. (Document No. 30, Defendant's Exhibit No. 1, p. 7); <u>see</u> (Document No. 30, Tr. p. 28) ("For the policy at the time, I'm not entirely sure. But from my individual self, it was normal practice for me not to have it on for just accidents that don't involve criminal activity."). The Court also notes that, although Officer Michal activated his BWC prior to arriving at the scene, he quickly turned off his BWC after he arrived and only re-activated his BWC after he started searching Defendant's car. (Document No. 30, Tr. p. 58). The CMPD guidelines, as Officer

12

Michal acknowledged in the hearing, require officers to record "until the search has been concluded and all evidence has been located." (Document No. 30, Tr. p. 59) (citing Document No. 30, Defendant's Exhibit No. 1, p. 8).

Law enforcement officers have a difficult job. In this case, the relevant CMPD policy regarding BWC use had been in effect for over five months prior to the incident. (Document No. 30, Defendant's Exhibit No. 1, p. 1). That two officers did not properly activate their BWCs in accordance with CMPD policy is not a minor matter. Compliance with these policies is not only important to the resolution of disputed incidents; it is also important for the promotion of public trust. Nevertheless, in the instant case, the undersigned does not find that the failure to fully comply with CMPD BWC guidelines amounts to bad faith and therefore Officer Tran-Thompson's testimony should not be suppressed.

### B. Defendant's Exit from Vehicle and <u>Terry</u> Stop

Defendant contends that he was ordered out of his vehicle "without reasonable suspicion or probable cause to believe that he had committed a criminal offense" and therefore "evidence gathered therefrom must be suppressed." (Document No. 20, p. 3). Moreover, because Officer Tran-Thompson did not activate his BWC in compliance with CMPD policy, Defendant asks the Court to "draw a strong inference that the video would have contradicted the government's version of events." <u>Id.</u> at 6.

For its part, the Government initially presented two different versions of events. In the "Government's Response To Defendant's Motion to Suppress Evidence," the Government stated that "He [Officer Tran-Thompson] instructed Aguirre to exit in the vehicle." (Document No. 23, p. 2). At the hearing, however, Officer Tran-Thompson testified that he did not instruct Defendant to get out of his car and that the Government's pleading is in error. Officer Tran-Thompson

13

testified that Defendant exited the vehicle on his own, and that his encounter with Defendant led to an appropriate Terry frisk.

Regarding the frisk, the Government argues that, "a police officer is allowed to frisk for weapons if he or she thinks that a person "may be armed and presently dangerous." (Document No. 23, p. 5) (citing Terry, 392 U.S. at 24). The Government observes the call for service was made in the early morning hours in an area "with a propensity toward criminal activity." (Document No. 23, p. 4-5). After arriving on the scene, Officer Tran-Thompson observed that Defendant, while inside the vehicle, "reach[ed] behind the passenger seat toward the floorboard." Id. at 1. Upon exiting the vehicle, Defendant "appeared to be under the influence of an impairing substance." Id. at 2. Then, Defendant "repeatedly return[ed] his left hand to his left pocket despite the police officer's telling him that he should keep his hands out of his pocket." Id. at 5. The Government further analogized to a Fourth Circuit decision affirming a ruling that "officers had reasonable suspicion that criminal activity was afoot" in part because "defendant kept putting his hands in his pockets and conducting himself in an 'evasive and suspicious manner.'" Id. (quoting United States v. Mayo, 361 F.3d 802 (4th Cir. 2004)). Lastly, the Government argues that Officer Tran-Thompson's seizure of the magazine was permissible under the "plain feel" doctrine. "[U]nder the 'plain feel' doctrine, a police officer may seize an item as contraband if he or she 'feels an object whose contour or mass makes its identity immediately apparent.'" (Document No. 23, p. 5) (citing Minnesota v. Dickerson, 508 U.S. 366, 375-376 (1993)).

Regarding the credibility of the witnesses, after considering all the relevant evidence, the undersigned finds Officer Tran-Thompson's testimony credible and concludes based thereon that Defendant voluntarily exited the vehicle. The undersigned observed the sworn testimony of the officers and Defendant and did not find Defendant's version of the events credible. At the hearing,

14

Defendant asserted that he did not move at all when the Officer approached him, neither to exit the vehicle nor to reach down behind the passenger seat. (Document No. 30, Tr. p. 74). The undersigned finds this difficult to believe. First, Officer Tran-Thompson testified that he saw Defendant reaching behind his seat. Id. at 12. Next, Officer Michal further testified that, after arriving on the scene, Officer Tran-Thompson told him Defendant "was messing around with something towards the center of the vehicle, right as he was pulling up." Id. at 53. Furthermore, when Officer Michal subsequently conducted a search of the car, he observed open containers and found a weapon wrapped in a jacket or shirt in that area. Id. In this case, the officers' consistent testimony and the logical inferences made from the evidence sufficiently corroborate Officer Tran-Thompson's testimony. Moreover, at the hearing, Defendant testified that he had been drinking that night. Id at 79. This is consistent with Officer Tran-Thompson's testimony that Defendant "appeared to be under the influence of an impairing substance." Id. at 13. Based on this evidence, the undersigned does not find Defendant's testimony credible and credits Officer Tran-Thompson's version of events.

The undersigned additionally concludes that the Terry strop was permissible. Based on the totality of the circumstances, including Defendant reaching behind the seat, the apparent possible impairment, and his furtive movements related to his front pockets, Officer Tran-Thompson clearly had reasonable suspicion for the Terry frisk that revealed the loaded magazine. See Terry, 392 U.S. at 30 (holding "reasonable suspicion depends on the totality of the circumstances"); see also Mayo 361 F.3d at 804-807 (being in a high crime area, combined with suspicious, evasive, and nervous conduct constituted "reasonable suspicion" and justified frisk for officer's detection.). Finally, in conducting the frisk, Officer Tran-Thompson immediately felt what he believed to be a bullet seated in a firearm magazine. (Document No. 30, Tr. p. 15). Therefore, under the "plain

15

feel" doctrine, Officer Tran-Thompson's seizure of the of magazine was acceptable. See Dickerson, 508 U.S. at 373-75; see also U.S. v. Hernandez-Mendez, 626 F.3d 203, 213 (4th Cir. 2010) (approving frisk of defendant's purse and, following the officer's "plain feel" of what seemed to be the barrel of pistol, the seizure of the firearm).

In sum, given the totality of circumstances, the Terry stop and subsequent seizure of the magazine is permissible.

### C. Probable Cause to Search

Like the magazine, Defendant again argues that the firearm found in Defendant's car should be suppressed because it was only discovered as a result of "the police officer's actions in ordering Mr. Aguirre-Cuenca out of the vehicle" and that this action "violated the Fourth Amendment's prohibition against unreasonable searches and seizures." (Document No. 20, p. 8).

The Government asserts in response that the facts supported a search for the firearm. "After the discovery of the firearm magazine in the defendant's left pocket, they had reason to suspect that the defendant possessed a weapon and that it was in the car he was driving." (Document No. 23, p. 6) (citing California v. Carney, 471 U.S. 386, 390-1, 105 S.Ct. 2013 (1985)). As previously noted, the Court credits the testimony of Officer Tran-Thompson and concludes based thereon that Defendant voluntarily exited the vehicle.

The Fourth Amendment generally requires the police to obtain a warrant before conducting a search. However, where there is probable cause to believe that a vehicle contains contraband or evidence of a crime, the "automobile exception" also applies and a vehicle that is "readily mobile" can be searched without a warrant. See, e.g. Maryland v. Dyson, 527 U.S. 465, 466 (1999); see also United States v. Kelley, 592 F.3d 586, 589-90 (4th Cir. 2010).

16

The undersigned finds that, based on the totality of the circumstances, there was sufficient probable cause to support a warrantless search of Defendant's vehicle. See Ornelas 517 U.S. at 696 (probable cause exists "where the known facts and circumstances are sufficient to a warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."). In this case, Officer Tran-Thompson observed Defendant reaching toward the rear passenger area and "digging around in the rear of the vehicle." (Document No. 30, Tr. p. 12). Next, Officer Tran-Thompson discovered a bullet seated in a magazine in Defendant's pocket. Id. at 15.

Although Defendant was handcuffed during the search of the vehicle, it is well established that the automobile exception "does not have a separate exigency requirement" apart from the inherent mobility of the automobile. Dyson, 527 U.S. at 467 (this is because "[e]ven in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] the application of the vehicular exception."); see also Kelly, 592 F.3d at 590-91 (declining to create an exception to the automobile exception when "police exercised control over the vehicle and had therefore eliminated any potential exigencies."). The officers' search and seizure related to the firearm was proper.

Finding that the officers had probable cause to search, the undersigned will not address the Government's alternative contention that this was a search incident to arrest. (Document No. 30, Tr. p. 87) See *United States v. Dickey–Bey,* 393 F.3d 449, 456 (4th Cir. 2004) ("We need not ... decide whether the search of [defendant's] automobile was properly incident to his arrest because we conclude that the circumstances in this case provided officers independent probable cause to search the automobile.").

**D. Miranda Warnings**

17

Case 3:19-cr-00141-FDW-DCK   Document 34   Filed 07/17/20   Page 17 of 20

In its motion to suppress, Defendant argued that "any alleged admissions made in the wake of the unlawful search and seizure" should be suppressed because Officer Tran-Thompson's actions in ordering Defendant out of the vehicle violated the Fourth Amendment. (Document No. 20, p. 8). Further, at the hearing, Defendant's counsel requested that the Court add to the record the legal issue of whether Defendant's admissions were the result of custodial interrogation without Miranda. (Document No. 30, Tr. p. 103). Defendant did not otherwise brief or discuss this issue.

In response, at the hearing, the Government seemed unclear as to what the record contained. The Government noted, "I think there's a point in time, I believe to Officer Michal or Abramo, where I think the Defendant admits that the firearm is his." (Document No. 30, Tr. p. 102). In the hearing, the Government questioned Defendant on why BWC footage showed Defendant misidentifying himself to the Officers as "Luis Aguilar." (Document No. 30, Tr. p. 78). However, the Government did not expressly state that these statements should be admissible.

The record here is not clear regarding what was said at the scene. After reviewing the BWC videos, the undersigned recommends that any alleged admissions should be suppressed for failure to properly Mirandize defendant. Miranda warnings are required when a subject is interrogated while in custody. See Miranda, 384 U.S. at 436. The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer, 468 U.S. at 440 (internal quotations omitted). The Supreme Court held that "interrogation" under Miranda, "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis,

18

446 U.S. 291, 292 (1980); see also United States v. Johnson, 734 F.3d 270, 276-78 (4th Cir. 2013), cert denied, 572 U.S. 11151 (2014).

In the present case, Officer Tran-Thompson placed Defendant in handcuffs thereby curtailing his freedom in a manner like a formal arrest. Next, Officer Tran-Thompson asked Defendant, "Pistola? Pistola? Where's it at?" (Document No. 30, Government's Exhibit No. 1, 1:10-1:20). This was a question that would reasonably elicit an incriminating response. It appears Defendant responds by saying "it's not mine." Additionally, while Officer Michal can later be heard asking Defendant for his name, the audio is poor and it is not entirely clear how Defendant responded. Given the poor record here and evidence of pre-Miranda custodial interrogation, the undersigned recommends that all statements made by Defendant on the scene be suppressed.

## V. CONCLUSION

As set forth above, the undersigned declines to find bad faith on the part of Officer Tran-Thompson for his failure to activate his BWC in accordance with CMPD policy. The undersigned further credits Officer Tran-Thompson's testimony and concludes that the officers conducted a lawful Terry frisk of Defendant and a lawful probable cause search of his vehicle. As such, the undersigned declines to suppress Officer Tran-Thompson's testimony or evidence recovered on the scene. However, any statements made at the scene by Defendant were the result of custodial interrogation without Miranda warnings and should therefore be suppressed.

## VI. RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED** that Defendant's "Motion To Suppress Evidence" (Document No. 20) is **GRANTED** in part and **DENIED** in part.

## VII. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenhour, 889 F.2d 1363, 1365 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), reh'g denied, 474 U.S. 1111 (1986).

**IT IS SO RECOMMENDED.**

Signed: July 17, 2020

David C. Keesler
United States Magistrate Judge